IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. CCB-20-0285 |
| v. | * | |
| | * | |
| JOHNSON B. OGUNLANA, | * | |
| | * | |
| Defendant. | * | |
| | ******* | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

While employed as a U.S. Postal Service letter carrier over the course of approximately 30 months between 2016 and 2019, defendant Johnson B. Ogunlana routinely stole mail, including credit cards and checks, and conspired with others to exploit stolen identities in order to make fraudulent purchases with the credit cards and to obtain cash through fraudulent deposits of the checks. For the reasons explained herein, the Government submits that a total sentence of 11 years (132 months) is sufficient and not greater than necessary to reflect the seriousness of Ogunlana's brazen fraud and theft schemes, to provide just punishment and impart respect for the law, and to deter Ogunlana and others from similar crimes.

**I.  Background**

Ogunlana is currently charged in 27 counts of a 40-count Second Superseding Indictment dated July 15, 2021, including one count of Conspiracy to Commit Bank Fraud and Mail Fraud, in violation of 18 U.S.C. § 1349; two counts of Bank Fraud, in violation of 18 U.S.C. § 1344; one count of Access Device Fraud, in violation of 18 U.S.C. § 1029(a)(5); 10 counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A; five counts of Theft of Mail by a

1

Postal Employee, in violation of 18 U.S.C. § 1709; and eight counts of Destruction of Mail by a Postal Employee, in violation of 18 U.S.C. § 1703(a).

On August 23, 2021—before jury selection on the first scheduled day of his jury trial—Ogunlana entered a plea agreement with the Government and entered pleas of guilty to Conspiracy to Commit Bank Fraud and Mail Fraud, Access Device Fraud, Aggravated Identity Theft, and Theft of Mail by a Postal Employee, in four counts of the Second Superseding Indictment (Counts One, Twelve, Twenty-Three, and Thirty-Two, respectively). In connection with his guilty pleas, Ogunlana admitted that, over the course of approximately two and one half years, he stole numerous items from the mail while working as a letter carrier with the United States Postal Service ("USPS"), including business checks and credit cards, and conspired with co-defendant Samson A. Oguntuyi to exploit these items and the identities of numerous postal customers for financial gain. During the course of the conspiracy, Ogunlana transferred stolen checks, credit cards and images of stolen checks and credit cards to Oguntuyi and other conspirators. Oguntuyi retrieved and provided the personal identifying information ("PII") of individual victims that the conspirators used to activate the credit cards, obtain additional credit cards in the victims' names, and register several fraudulent businesses, employer identification numbers, and business bank accounts in order to negotiate the stolen checks. Ogunlana and Oguntuyi traded images of stolen and exploited credit cards and checks, PII of individual victims, and plans and instructions about using the credit cards and checks during lengthy correspondence conducted through WhatsApp, a mobile messaging application. Over the protracted course of the conspiracy, Ogunlana and his co-conspirators exploited and defrauded numerous individual victims, as well as several financial institutions and credit card companies.

**II.     Maximum Penalties**

Pursuant to 18 U.S.C. §§ 1344, 1349, 1029(c)(1)(a)(ii), and 1709, the combined maximum term of incarceration for Conspiracy to Commit Bank Fraud (Count One), Access Device Fraud (Count Twelve), and Theft of Mail by a Postal Employee (Count Thirty-Two) is **50 years**, and 18 U.S.C. § 1028A mandates a sentence of **two years** for Aggravated Identity Theft (Count Twenty-Two) to be imposed consecutively with any sentence imposed for the other counts.  The maximum concurrent period of supervised release is five years.

**III.    Sentencing Guidelines Range**

The Government disputes the offense level computation outlined in the Presentence Investigation Report ("PSR")—specifically, the loss enhancement of 14 levels for Conspiracy to Commit Bank Fraud and Mail Fraud (Count One), Access Device Fraud (Count Twelve), Theft of Mail by a Postal Employee (Count Thirty-Two), and relevant conduct,[1] as described in Paragraph 27, which is based upon losses exceeding $550,000 but not exceeding $1,500,000.  The Government contends that intended losses exceeded $1,500,000, and the loss enhancement should be 16 levels pursuant to U.S.S.G. § 2B1.1(b)(I).  There is no dispute that, in stealing checks issued to two Baltimore, Maryland-area businesses amounting to approximately $565,000, Ogunlana intended losses of at least that amount.  The loss enhancement described in

---

[1] There is no dispute that these three counts and relevant conduct group pursuant to U.S.S.G. § 3D1.2(d).  Aggravated Identity Theft (Count Twenty-Three) constitutes a second group and, pursuant to U.S.S.G. § 2B1.6, prescribes the addition of 24 months to the sentencing guidelines range prescribed for the first group.

3

Paragraph 27 of the PSR does not account for intended losses arising from Ogunlana's theft of more than 200 credit cards.[2]

Application Note 3(C) of U.S.S.G. § 2B1.1 provides that the sentencing court "need only make a reasonable estimate of the loss." Application Note 3(F)(i) sets a minimum loss amount for each stolen or exploited credit card at $500, but intended losses for access device fraud can be more specifically determined by the credit limits for the individual credit card accounts. *See United States v. Lewis*, 312 F. App'x 515, 518 (4th Cir. 2008) (affirming district court's estimation of intended losses by taking the daily credit limit of the fraudulent debit card and multiplying it by the number of days the defendant possessed the card, and citing decisions of the Eleventh Circuit, First Circuit, and Fifth Circuit in support); *United States v. Muhammed*, 108 F. App'x 775, 777 (4th Cir. 2004) (affirming district court's conclusion that victims were exposed to potential losses exceeding the credit limit of each credit card account, including credit cards not used by the defendant, and noting that "[t]here circuits have upheld use of the credit limit for unused unauthorized access devices to determine the intended losses").

During the investigation of the instant case, a special agent and an investigative analyst with the USPS Office of Inspector General reviewed WhatsApp correspondence between Ogunlana and Oguntuyi in which the conspirators discussed more than 200 credit cards and credit limits totaling at least approximately $995,000 associated with approximately 111 of those cards. Exhibit 1 provides a list of credit cards that are discussed or photographed during the WhatsApp correspondence between Ogunlana and Oguntuyi. Exhibit 2 lists those credit cards

---

[2] In the plea agreement, the parties left the loss amount and resultant loss enhancement under U.S.S.G. § 2B1.1(b)(1) open to dispute at sentencing between 14 and 16 levels.

for which credit limits are noted in the WhatsApp correspondence, which total more than $995,000.

By specifically noting and discussing credit limits associated with the credit cards they intercepted and stole, both Ogunlana and Oguntuyi were clearly aware that these cards could be exploited up to and including each of these credit limit amounts. By stealing and compromising each of the credit card accounts, the conspirators obviously intended losses up to the combined amounts of the credit limits noted in their correspondence.

Combining the approximate $995,000 in total credit limits discussed between Ogunlana and Oguntuyi with the $565,000 in intended losses from the stolen business checks results in a total estimated intended loss figure of $1,560,000. This loss figure does not include an additional $500 that may be assessed for each credit card that Ogunlana photographed and discussed in WhatsApp correspondence without specific mention of a credit limit. There were approximately such 100 credit cards for which a total loss of $50,000 may be estimated pursuant to Application Note 3(F)(i) of U.S.S.G. § 2B1.1. These loss amounts also do not reflect additional frauds conducted by Ogunlana on the side of the offenses charged in this case, which are described in Part V.I. below.

Because a reasonable estimate of the total intended loss exceeds $1,500,000 but does not exceed $3,500,000, the PSR should compute a loss enhancement of 16 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I).

Thus, Ogunlana's offense level for the fraud conspiracy group should be computed as follows:

| Offense Level | Description | U.S.S.G. Provision |
|---|---|---|
| 7 | Base offense level for Conspiracy to Commit Bank Fraud | 2X1.1(a), 2B1.1(a)(1) |
| +16 | Loss more than $1,500,000 | 2B1.1(b)(1)(I) |
| +2 | Involving 10 or more victims | 2B1.1(b)(2)(A) |
| +2 | Sophisticated means | 2B1.1(b)(10) |
| +2 | Production/trafficking unauthorized access devices | 2B1.1(b)(11) |
| +2 | Abuse of position of public trust | 3B1.3 |
| -2 | Acceptance of responsibility | 3E1.1(a)[3] |
| **29** | **Total offense level** | |

The total offense level of 29 and criminal history category III, as computed in Paragraph 45 of the PSR, result in a guidelines range of **108 to 135 months** for the fraud conspiracy and relevant conduct.

Pursuant to U.S.S.G. § 2B1.6, the guidelines sentence for Aggravated Identity Theft is **24 months**, which must be added to the guidelines range for fraud conspiracy and relevant conduct and results in a total guidelines range of **132 to 159 months**. For reasons outlined herein, the Government recommends a sentence at the low end of this range.

IV.   **Nature and Circumstances of the Offenses**

As noted above, the fraud and theft scheme and conspiracy in this case stretched for more than two and a half years—from July 2016 to February 2019—and involved repeated, rapacious, and at times daily thefts from the mail conducted personally by Ogunlana, disturbingly frequent

---

[3] Given that Ogunlana did not decide to plead guilty and to accept responsibility for his crimes until the date his trial was scheduled to begin, the Government does not intend to make a motion for a third-level decrease under U.S.S.G. § 3E1.1(b).

exploitation of victims' dates of birth and social security numbers, the creation of several fake businesses, and the forgery of victims' names to open fraudulent bank accounts and to negotiate stolen checks. Examination of Ogunlana's and Oguntuyi's personal bank accounts revealed substantial cash deposits during the time period of their scheme.

Ogunlana was a USPS letter carrier throughout the duration of the criminal scheme. At the outset of his employment with USPS in October 2014, Ogunlana reviewed and signed documents acknowledging his duty to protect the security of United States mail and his understanding that theft of mail by a USPS employee was a federal crime and could result in imprisonment.

The investigation began with a series of reports to USPS-OIG from victims and other law enforcement agencies that implicated Ogunlana in a series of thefts of credit cards and business checks from the mail.

**A. Possession and Use of Stolen Credit Cards in May 2018**

On May 18, 2018, a vehicle driven by Ogunlana was stopped on the Route 267 Dulles Toll Road in Northern Virginia by the Metropolitan Washington Airports Police, and Ogunlana was arrested for Driving While Intoxicated.[4] During the arrest, Ogunlana was found in possession of approximately 22 credit cards in other persons' names, including a Citibank credit card ending in 7302 and issued in the name of V.M., and a Synchrony credit card ending in 9295 and issued in the name of S.S. Investigation of the victims' names listed on the cards revealed residential addresses for most of them that received mail service out of the USPS facility where Ogunlana worked as a mail carrier, the Brooklyn South Carrier Annex in Brooklyn, Maryland.

---

[4] This arrest is noted in Paragraph 42 of the PSR.

V.M. and S.S. each later reported that she had applied for a credit card and expected the card to arrive by mail, but the card never arrived. Instead, each victim eventually received a credit card bill that reflected charges that she did not make.

**B. Possession and Use of Stolen Credit Card in August 2018**

In August 2018, the Baltimore Police Department ("BPD") investigated fraudulent charges made on a Chase Bank credit card ending in 8151 and issued to K.Y., a Brooklyn resident and BPD officer. During the investigation, BPD obtained surveillance video of Ogunlana and co-conspirator Sunday Ajayi using the credit card to make purchases at a gas station and liquor store, both located in Baltimore, Maryland, on August 14, 2018. Ogunlana was observed in the video wearing his USPS uniform and allowing Ajayi to conduct the fraudulent transactions. Further investigation revealed that the card was also used to make purchases at a local Apple Store totaling approximately $2,276 on the same date. K.Y. reported that he had applied to upgrade an existing credit card account but did not receive the new card in the mail as expected. Instead, he received alerts on his phone about the card being used at the Apple Store and discovered several fraudulent transactions when he went online to review the account.

**C. Thefts and Fraudulent Deposits of Stolen Business Checks in 2018 and 2019**

In September and October 2018, two Brooklyn-area businesses—Evan Transportation Inc. and DeVere Insulation Company—reported that checks they expected to arrive by mail had not arrived but were being deposited into fraudulent accounts at various banks. Both businesses' addresses were serviced out of the Brooklyn South Carrier Annex. Further investigation revealed that fraudulent registrations of businesses were made in various states in names similar to Evan

8

Transportation and DeVere Insulation Company, and that stolen PII was used to obtain employer identification numbers ("EINs") for some of these businesses. The EINs were then used to open business bank accounts in the fake businesses' names at various financial institutions, which were then used to deposit the checks and make subsequent cash withdrawals.

For example, on November 6, 2018, articles of incorporation were filed with the Maryland state government in the name of "DeVere Insulation Company, LLC" listing the name of T.B. as resident agent. T.B. was a postal customer who had the misfortune of residing on Ogunlana's assigned mail delivery route and never authorized her identity to be used in connection with Ogunlana's scheme. On November 8, 2018, T.B.'s name, date of birth, and social security number were used to obtain an EIN from the IRS for the business name DeVere Insulation Company. On November 23, 2018, T.B.'s PII and the fraudulent EIN were used to open two fraudulent business bank accounts in the name of DeVere Insulation Company at a Wells Fargo branch in Maryland. On December 5 and 6, 2018, several stolen checks totaling approximately $88,000 and made payable to the real victim business DeVere Insulation Company were fraudulently deposited into the two Wells Fargo accounts. Bank surveillance footage captured Oguntuyi making these deposits at three different Wells Fargo branches in the Baltimore area. T.B.'s signature was forged in false endorsements on the backs of the stolen checks.

Ultimately, in furtherance of his criminal scheme, Ogunlana stole checks totaling approximately $565,000 from mail addressed to Evan Transportation and DeVere Insulation in 2018 and 2019. Ogunlana was captured on bank surveillance on October 31, 2018, and

November 3, 2018, personally depositing several checks stolen from DeVere Insulation at a Wells Fargo branch in Baltimore, Maryland.

**D. Possession and Use of Stolen Credit Cards in December 2018**

In late December 2018, a wallet belonging to Ogunlana was recovered from outside White Marsh Mall in White Marsh, Maryland and turned in to Baltimore County Police Department. The wallet contained Ogunlana's photo identification and 13 credit cards issued in in other persons' names, including a Chase credit card ending in 3740 and issued in the name of W.S., and two Citibank credit cards ending in 2195 and issued in the names of B.I.S. and E.S., a married couple. Each of the victims resided at addresses serviced out of the Brooklyn South Carrier Annex where Ogunlana worked. B.I.S. and W.S. each reported that his wife had applied for the credit cards near the end of 2018 but his card never arrived. Each card was subsequently used to make fraudulent charges that the victims never made or authorized. Ogunlana's wallet contained a receipt for one of the fraudulent transactions made using the card ending in 2195—the purchase of a Wal-Mart gift card on December 24, 2018.

Among the fraudulent charges made using the card issued to W.S. were business registration fees paid to the Georgia state government on December 26, 2018, for fraudulent registrations made in the names of "DeVere Insulation Company Inc." and "Evan Transportation Inc." These business registrations were made by a conspirator using the identity of Georgia resident J.C., a stolen identity used many times during Ogunlana's scheme.

**E. Surveillance of Ogunlana in December 2018 and January 2019**

Having identified Ogunlana as a suspect in the reported mail thefts, on December 21, 2018, USPS-OIG placed in the mail stream at the Brooklyn South Carrier Annex an identifiable

mail piece addressed to the business victim Evan Transportation Inc. and containing a check made payable to the victim. Ogunlana was observed taking possession of the mail piece, preparing it for delivery, and taking it with him out of the USPS facility. An employee of Evan Transportation Inc. later confirmed that mail was delivered that day but that it did not include the test mail piece containing the check.

USPS-OIG also installed a covert camera in Ogunlana's mail delivery vehicle and recorded him on several dates in December 2018 and January 2019. Ogunlana was captured on several occasions in the mail delivery vehicle opening mail pieces, examining the contents, discarding envelopes out the window, handling credit cards while using his cell phone, and placing mail pieces into his lunch cooler and other bags.

**F. Searches and Interview of Ogunlana in February 2019**

On February 4, 2019, USPS-OIG obtained a federal search warrant to search Ogunlana's person and personal vehicle, to include any electronic devices found in those locations. At the end of Ogunlana's work shift on the following date, a USPS-OIG agent approached Ogunlana, and Ogunlana agreed to participate in an interview and consented to searches of two cell phones (Apple iPhones in his personal possession) and lunch cooler. Ogunlana was found in possession of a Chase Bank credit card issued to victim Y.C., a resident of Brooklyn, and several gift cards. Ogunlana's lunch cooler contained a mail piece from SunTrust Bank addressed to aforementioned victim T.B. and "Devere Insulation Compa" providing a personal identification number ("PIN") for a debit card associated with a fraudulent business bank account. The debit card itself was recovered during the search of Ogunlana's personal vehicle. Additional evidence found during the vehicle search included:

- a third Apple iPhone;

- a receipt for a Maryland business registration charge;

- a receipt for a Western Union money order, later revealed to have been made payable to DeVere Insulation, endorsed with T.B.'s name, and deposited by Oguntuyi into a fraudulent account at Wells Fargo on December 5, 2018;

- at least seven torn checks made payable to DeVere Insulation and Evan Transportation, some still in their mailing envelopes;

- credit cards issued to various Maryland residents, and credit card mailers listing addresses serviced out of the Brooklyn South Carrier Annex, including a ripped credit card mailer addressed to E.B., a victim residing on Ogunlana's assigned mail delivery route, with the credit card removed; and

- a bundle of approximately 250 standard mail pieces from Gold's Gym, scheduled for delivery in late January 2019.

During the interview, Ogunlana admitted that he intercepted from the mail credit cards and bank correspondence ordered by co-conspirators to arrive at particular addresses. He also admitted that he lost his wallet at White Marsh Mall in December 2018 and had used credit cards in other persons' names to make retail purchases.

Forensic examination of Ogunlana's cell phones revealed the following:

- a photo of Ogunlana and Oguntuyi together, taken on November 6, 2018, approximately 10 minutes before Oguntuyi was captured by bank surveillance depositing stolen checks made payable to DeVere Insulation Company at a Wells Fargo branch in Abingdon, Maryland;

- a photo of Oguntuyi captured on December 29, 2018, the same date Oguntuyi was captured on bank surveillance depositing stolen checks made payable to Evan Transportation Inc. at a Wells Fargo branch in Baltimore, Maryland;

- photos of Oguntuyi's Georgia driver's license and social security card;

- receipts reflecting deposits of stolen checks;

- screenshot images reflecting payments received from Oguntuyi;

- a screenshot image of a USPS Informed Delivery mail cover for correspondence from Wells Fargo to T.B. and DeVere Insulation Company at an address serviced out of the Brooklyn South Carrier Annex;

- various photos of mail; and

- WhatsApp correspondence between Ogunlana and various co-conspirators, including Oguntuyi and Ajayi.

## G. WhatsApp Correspondence Between Ogunlana and Oguntuyi

The WhatsApp correspondence between Ogunlana and Oguntuyi spanned the time periods from July 2016 through April 2017 and from June 2017 through November 2018. During the former time period, the conspirators discussed various credit cards issued to other persons, "ordering" credit cards to arrive at particular locations provided by Ogunlana (and accessible to him in his capacity as a USPS letter carrier), accessing online accounts for the credit cards, activating the cards and creating PINs for them, and using the cards to purchase particular items, including personal electronics. During the latter time period, Ogunlana sent Oguntuyi images of over 200 stolen credit cards and related mail. In response, Oguntuyi would commonly provide accurate dates of birth and social security numbers for the victim cardholders in order for the credit cards to be activated and used to make purchases.

For example, on May 4 and 7, 2018, Ogunlana sent Oguntuyi photos of mail and credit cards issued to V.M. and S.S., respectively. On May 8, 2018, Oguntuyi provided Ogunlana with V.M.'s and S.S.'s true dates of birth and social security numbers. Notably, Ogunlana was found in possession of credit cards issued to V.M. and S.S. during his arrest by MWAA Police on May 18, 2018, after the cards had been used to make fraudulent purchases.

On August 14, 2018, Ogunlana sent Oguntuyi a photo of a mail piece and credit card issued to K.Y., and Oguntuyi provided the true date of birth and social security number of K.Y.'s

13

father, who has the same first and last name. On the same date, Ogunlana and Ajayi were captured conducting fraudulent transactions with K.Y.'s credit card.

Oguntuyi would regularly indicate to Ogunlana when he might expect particular mailings of credit cards to particular addresses and directed Ogunlana to look out for them and intercept them. Ogunlana eventually began sending Oguntuyi images of stolen business checks, and the two began to discuss negotiating the checks via fraudulent accounts—specifically, checks made payable to DeVere Insulation Company and Evan Transportation. Oguntuyi regularly directed Ogunlana to send him credit cards and checks Ogunlana showed him and provided his residential address in Georgia. Ogunlana would take photos of the packages he sent to Oguntuyi before sending them.

### H. WhatsApp Correspondence Between Ogunlana and Ajayi

WhatsApp correspondence between Ogunlana and Ajayi, as well as other co-conspirators, was also recovered from one of Ogunlana's cell phones. The correspondence with Ajayi revealed that, in 2018, Ogunlana provided Ajayi with at least 30 credit cards stolen from at least 27 postal customers in order for Ajayi to make fraudulent retail purchases. Ajayi used the stolen credit cards to purchase personal electronics (such as Apple MacBook computers and iPhones), clothing, and other merchandise. Ajayi would convey these goods to Ogunlana, who would then sell the items on the street and give Ajayi a share of the proceeds.

### I. Additional Fraudulent Conduct by Ogunlana

The investigation revealed that the above described check fraud and credit card fraud were not the only financial frauds conducted by Ogunlana.

On February 4, 2017, Oguntuyi asked Ogunlana for information about a bank account via WhatsApp. On the same date, Ogunlana responded with a bank account number and routing number for Bank of America. Ogunlana also supplied a user name (which contained the name of the business account holder), password, and answers to security questions. On February 16, 2017, a check in the amount of $49,000 was fraudulently deposited into the account identified by Ogunlana. An additional deposit of $11,000 was made into the account on February 24, 2017. These deposits were followed by several cash withdrawals and transfers of funds totaling more than $60,000 between February 24, 2017, and February 27, 2017. During this period of time, the defendants discussed the account, the balance in the account, and efforts to access the funds.

In September 2017, Ogunlana and Ajayi exchanged messages regarding apparent drop accounts used to receive fraud proceeds. On September 30, 2017, Ogunlana sent Ajayi banking coordinates for a business account at TD Bank in the name of P.R. Production. On October 1, 2017, Ajayi responded with the following list: "Bank name; Account name; Online username &; Password." Ogunlana responded, "Ok." On October 2, 2017, Ogunlana provided coordinates for the same account as well as a username and password. On October 3, 2017, the Defendant provided a smartphone screenshot of a log-in page for a TD Bank account reflecting a failed attempt to log in. On October 4, 2017, Ogunlana sent Ajayi a photo of a laptop computer displaying online access to the P.R. Production account at TD Bank. Records obtained from TD Bank reflect a fraudulent check deposit in the amount of $9,888 into the P.R. Production account on October 3, 2017, which was charged back three days later.

## V. History and Characteristics of the Defendant

Ogunlana was employed as a USPS letter carrier during the time period of the above described theft and fraud schemes. Paragraphs 40 through 42 of the PSR reflect several prior convictions for driving under the influence of alcohol. Ogunlana committed the instant offenses while on probation in at least two of this prior criminal cases.

## VI. Purposes of Sentencing

The Government submits that a total sentence of 11 years in custody followed by a five-year period of supervised release is sufficient and not greater than necessary to satisfy the goals of sentencing outlined in 18 U.S.C. § 3553(a)(2).

### A. The Sentence Must Reflect the Seriousness of Defendant's Criminal Acts

An 11-year sentence is necessary to reflect to gravity of Ogunlana's central role in the above described criminal schemes. Clearly, this is not the case of a one-time misstep or even a series of poor split-second decisions. Ogunlana's crimes reflect a willful violation of his oath to protect U.S. mail and a long-continuing commitment to theft and fraud, in complete and utter disregard for the impact his conduct may have on the numerous postal customers whose mail, checks, credit cards, and sensitive information he stole and whose identities he exploited. At no point in the 30-month process of Ogunlana's criminal schemes and conspiracies did he relent in his thefts and exploitation of his victims' mail and PII. Ogunlana possessed numerous fruits and instrumentalities of his crimes on the day he was first confronted by federal authorities in early February 2019.

A sentence below the guidelines range is not adequate to account for the gravity of Ogunlana's conduct, its repetitive nature, the high losses, the high number of victims impacted, and the harms to which it exposed Ogunlana's many victims.

**B. The Sentence Must Deter Defendant from Further Crimes and Protect the Community**

A lengthy sentence in this case followed by a reasonable term of supervised release is necessary to protect the public from further crimes of Ogunlana and to deter him from reoffending. It is notable that Ogunlana's arrest in May 2018 while in possession of more than 20 credit cards in victim's names did not deter him from resuming the fraud with Oguntuyi and Ajayi after his release from custody. Furthermore, the clear warnings Ogunlana received at the outset of his employment with USPS about federal charges and incarceration for stealing mail did not deter him from violating his duties and stealing mail on a routine basis for years. Ogunlana presents a stark and persistent economic danger to the community. An 11-year prison sentence and five-year period of supervised release are necessary to give the victims and others in the community any confidence that the public will be safe from further thefts and frauds by the defendant.

**C. The Sentence Must Afford Adequate General Deterrence**

An 11-year sentence is also necessary to afford adequate general deterrence from identity theft and fraud crimes, particularly for USPS employees who may be tempted to abuse their positions and violate their duties by stealing and exploiting the sensitive material that is commonly entrusted to them. Only an appropriately lengthy sentence stands a chance of deterring persons in the community like Ogunlana who possess no internal inhibitions against

17

stealing large volumes of mail over time and using victims' dates of birth and social security numbers for personal gain. There is no reason to believe that a downward variance will suffice in sending the necessary message to the public that thefts and frauds like the defendant's will not be tolerated.

**D. The Sentence Must Avoid Unwarranted Sentence Disparities**

A guidelines sentence is necessary in this case "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). Although the sentencing guidelines are advisory, the Supreme Court has recognized that "the post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review." *Peugh v. United States*, 569 U.S. 530, 541 (2013). Indeed, "the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

The U.S. Sentencing Guidelines Manual continues to provide useful sentencing benchmarks in federal fraud and theft cases and promotes uniformity among these cases. In the majority of federal fraud and theft cases across the country, courts impose sentences pursuant to the Guidelines Manual.[5] Only 35.7% of offenders in these cases in fiscal year 2018 received a downward variance. No mitigating factors are present in this case to justify a sentence below the

---

[5] *See* U.S. Sentencing Commission, Quick Facts: Theft, Property Destruction, and Fraud Offenses (Fiscal Year 2018), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY18.pdf

18

132-to-159-month Guidelines range. The government recommends a total sentence at the low end of that range: 132 months.

## VII. Restitution

Ogunlana has agreed to entry of a restitution order for the full amount of victims' losses. The Government will submit its request for restitution in a separate filing listing losses for various victims.

## VIII. Conclusion

For the foregoing reasons, the Government submits that an 11-year sentence is sufficient, but not greater than necessary, to afford adequate deterrence, to protect the community, to provide just punishment, and to reflect the seriousness of Ogunlana's lengthy and devastating series of financial fraud and identity thefts in this case. Accordingly, the Government recommends a total sentence of 108 months on Counts One, Twelve, and Thirty-Two, and a consecutive sentence of 24 months on Count Twenty-Three, for a total sentence of 132 months in the custody of the Bureau of Prisons. The Government requests further that the Court impose a five-year term of supervised release, with the conditions of release recommended in the PSR to provide added protection against recidivism by the defendant.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: \_\_\_\_\_/s/_____
Matthew J. Maddox
Assistant United States Attorney