**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. CCB-20-0285** |
| **v.** | * | |
| | * | |
| **JOHNSON BIDEMI OGUNLANA,** | * | |
| | * | |
| **Defendant.** | * | |

**\*\*\*\*\*\*\***

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT JOHNSON B. OGUNLANA'S SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, submits this memorandum in opposition to the sentencing memorandum filed by defendant Johnson B. Ogunlana (ECF No. 95).

As stipulated in the plea agreement and further detailed in the Government's sentencing memorandum filed at ECF No. 92, Ogunlana's intricate and prolific criminal schemes spanned no less than 30 months and was fueled by his repetitive thefts of mail while working as a letter carrier, amounting to several hundred thousand dollars in checks and well over 250 credit cards. He conspired with defendant Samson A. Oguntuyi to seek out dozens of victims' birth dates and social security numbers in order to effect virtually countless fraudulent transactions, spurred by greed.

But, in his filings, Ogunlana attempts to side-step and minimize the gravity of his rampant criminal behavior and to tamp down the attendant Sentencing Guidelines range. He essentially asks this Court to ignore literal volumes of evidence of his guilty knowledge and intentions on the disputed issue of loss, and to turn a blind eye toward the admitted sophistication and sheer ambition of his schemes. These aggravating factors fully support the Government's request for a total sentence of 11 years (132 months). The defendant fails to cite any mitigating factors that even begin to justify his request for a variance down to the statutory minimum two-year sentence.

1

**TABLE OF CONTENTS**

I.   THE TOTAL LOSS AMOUNT EXCEEDS $1,500,000 ...................................................3

    A.   Legal Framework .......................................................................................5

    B.   Relevant Facts ...........................................................................................6

    C.   Credit Limits Specified by Defendants Provide a Reasonable Estimate of Intended Loss for Stolen Credit Cards ........................................................8

        1.   *United States v. Lewis* (cited by the Government in ECF No. 92 at 4) ...........10
        2.   *United States v. Muhammed* (cited by the Government in ECF No. 92 at 4) ...11
        3.   *United States v. Diallo* (cited by Oguntuyi in ECF No. 102 at 7) .................12

    D.   Any Reasonable Estimate of Intended Loss for Each Stolen Credit Card Without a Specified Credit Limit Would be at Least $500 ......................................14

II.   OGUNLANA'S REQUEST FOR A VARIANCE DOWN TO THE 24-MONTH MINIMUM IS UNJUSTIFIED .............................................................................16

    A.   Applicable Sentencing Guidelines Factors Represent Significant Aggravating Circumstances in this Case ......................................................................17

        1.   *Ogunlana's Conduct Was Intricate In Its Organization and Sophistication* ......17
        2.   *Defendants Produced and Trafficked Unauthorized Access Devices and Means of Identification* .........................................................................................19
        3.   *Defendants Victimized Over 250 Individual Victims and Numerous Businesses* .20
        4.   *Ogunlana Profited From His Crimes* ..............................................................21
        5.   *Ogunlana Flagrantly Abused the Public's Trust On a Serial Basis* ..............22

    B.   OGUNLANA'S CRIMES WERE UNUSUALLY SERIOUS, BY ANY REASONABLE MEASURE .........................................................................23

        1.   *Ogunlana's Culpability for the Offenses Is Extremely High* ........................24
        2.   *Ogunlana's Impact On Victims and Abuse of Their Vulnerabilities Were Substantial* .........................................................................................26
        3.   *Ogunlana Poses an Acute Economic Danger to the Community* .................27

    C.   OGUNLANA'S CHARACTER FOR DECEIT IS FIRMLY ESTABLISHED....28

III.   CONCLUSION...................................................................................................30

I.      **The Total Loss Amount Exceeds $1,500,000**

The Government is filing contemporaneously with this memorandum several sealed exhibits, two of which (**Exhibit 22** and **Exhibit 23**) are submitted in replacement of those previously filed as Exhibits 1 and 2 at ECF Nos. 94 and 98 in December 2021.  Since the filing of the latter exhibits in December, a case agent was tasked with checking the number of credit cards and the credit limits listed in the exhibits against the relevant WhatsApp correspondence between the defendants (which is submitted in full as **Exhibit 24** and **Exhibit 25**, and in excerpted form as **Exhibit 24-A** and **Exhibit 25-A**).  The agent discovered minor errors and made corrections reflected in the following exhibits filed contemporaneously with this memorandum:

- **Exhibit 22** provides a list of credit cards that are discussed or photographed during the WhatsApp correspondence between Ogunlana and Oguntuyi, which total 278 *(replacing Exhibit 1 filed at ECF Nos. 94 and 98)*.  Corrected cells are highlighted.
- **Exhibit 23** lists those credit cards for which credit limits are noted in the WhatsApp correspondence, which now total $995,389 *(replacing Exhibit 2 filed at ECF Nos. 94 and 98)*.  Corrected cells are highlighted.

The Government submits that the U.S.S.G. §2B1.1(b)(1) loss amount in this case is properly computed as follows:

| Estimated Amount | Factual Basis |
|---|---|
| $565,000 | Total amount of checks stolen from DeVere Insulation Company and Evan Transportation Inc. |
| $995,389 | Total amount of credit limits for approximately 115 credit cards explicitly contemplated by defendants Oguntuyi and Ogunlana in their WhatsApp correspondence |
| $50,000 | Estimated loss amount of $500 for at least 100 credit cards for which credit limits were not specifically noted in WhatsApp correspondence |
| $58,888 | Fraudulent check deposits into "EZ Go Towing" and "P.R. Production" accounts |
| **$1,699,277 total** | |

Ogunlana disputes the loss amounts assessed above for his conspiracy to steal 250 credit cards from the United States mail.[1]   The defendant goes to great lengths to argue that the Sentencing Guidelines cannot account for the total value he clearly knew the stolen credit cards possessed when he willfully conducted the theft and fraud scheme.   The only credit card loss he is willing to concede is limited to fraudulent charges made using the stolen credit cards.   Actual losses from use of stolen credit cards are inadequate to compute the loss amount under § 2B1.1(b)(1) because the intended loss is undoubtedly higher.   *See* U.S.S.G. § 2B1.1, Application Note 3(A) (defining "loss" as "the ***greater*** of actual loss or intended loss") (emphasis added).   The defendant asks this Court to write off the intended loss as if it cannot be reasonably estimated.

Ogunlana argues that credit limits for the stolen credit cards do not provide a reasonable measure of intended loss.   On this point, the extra-Circuit case Ogunlana relies upon is readily distinguishable from the instant case and, moreover, is not binding on this Court.   The Fourth Circuit cases cited in the Government's sentencing memorandum (ECF No. 92), while unpublished, are on point and consistently support the use of credit limits to assign value to stolen credit cards and thereby assess intended losses from the theft.

Before addressing the defendant's arguments in detail, a review of the legal framework and relevant facts is in order.

---

[1] The parties agree that the loss amount for the stolen business checks totals approximately $565,000.  It is unclear whether Ogunlana will dispute the loss amount for the fraudulent check deposits into the "EZ Go Towing" and "P.R. Production" accounts.  Pages 189 through 218 and of **Exhibit 24** (excerpted in **Exhibit 24-A**) display Ogunlana and Oguntuyi's communications about the "EZ Go Towing" account.  A record of that account reflecting a fraudulent check deposit of $49,000 was previously submitted under seal as **Exhibit 5** at ECF No. 101-5.  **Exhibit 26** is an excerpted extraction of WhatsApp correspondence between Ogunlana and Ajayi displaying their communications about the "P.R. Production" account.  **Exhibit 27** is a record from that account that reflects an attempted fraudulent deposit of $9,888.

### A.  Legal Framework

The Sentencing Guidelines provision for determining the offense level for theft and fraud offenses includes an increase of the offense level for loss in U.S.S.G. § 2B1.1(b)(1), with the level of increase determined by the loss amount.  Here, the parties' dispute is confined to whether there is a 14-level increase for a loss exceeding $550,000 (Ogunlana's position) or a 16-level increase for a loss exceeding $1,500,000 (the Government's position).

Importantly, the sentencing court "need only make a reasonable estimate of the loss, given the available information." *United States v. Wolf*, 860 F.3d 175, 197 (4th Cir. 2017) (internal quotation marks and citation omitted).  "The loss amount 'must be supported by a preponderance of the evidence' but 'need not be determined with precision.'" *Id.* (citation omitted).  Loss resulting or intended to result from the conduct of co-conspirators within the scope of the conspiracy may be attributed to a defendant if the conduct was "in furtherance of, and reasonably foreseeable in connection with the criminal activity." *United States v. Otuya*, 720 F.3d 183, 191 (4th Cir. 2013) (quoting U.S.S.G. § 1B1.3(a)(1)(B)) (internal quotation marks omitted).

For purposes of § 2B1.1, "loss" is defined as "the greater of actual loss or intended loss." *United States v. Savage*, 885 F.3d 212, 227 (4th Cir. 2018) (quoting Application Note 3(A)). "Actual loss" is further defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  *United States v. Shephard*, 892 F.3d 666, 672–73 (4th Cir. 2018) (quoting Application Note 3(A)(i)).  Similarly, the Merriam-Webster dictionary's definition of "loss" includes "the act or fact of ***being unable to keep or maintain*** something or someone" and "the harm or privation resulting from ***losing or being separated from*** someone or something."  *See* https://www.merriam-webster.com/dictionary/loss (emphasis added).  "Pecuniary harm" is "harm that is monetary or that otherwise is readily measurable in money."  U.S.S.G. § 2B1.1, Application

Note 3(A)(iii).  Thus, "[t]he general rule is that loss is determined by measuring the harm to the victim."  *United States v. Ruhe*, 191 F.3d 376, 391 (4th Cir. 1999).  In theft and fraud cases, "[a] determination of the amount of the loss suffered focuses . . . on the value of the money, property, or services unlawfully taken."  *United States v. Marcus*, 82 F.3d 606, 608 (4th Cir. 1996) (internal quotation marks and citation omitted).

"Intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur...."  *Savage*, 885 F.3d at 227 (quoting Application Note 3(A)(ii)).  Thus, it is clear that, whether actual or intended, loss under § 2B1.1 is focused on the value of that which was actually, or intended to have been, **deprived or taken or separated from** the victim.

Application Note 3(F)(i) provides that, in cases involving unauthorized access devices (*e.g.*, stolen credit cards), "loss" includes unauthorized charges "and shall be not less than $500 per access device."

### B.  Relevant Facts

In connection with his guilty plea, Ogunlana admitted that, between July 2016 and February 2019, while working as a United States Postal Service ("USPS") letter carrier, he knowingly and willfully conspired and agreed with defendant Samson A. Oguntuyi and others to execute fraud schemes and to steal matters from the mail for the purpose of executing the fraud schemes.  Among other things, Ogunlana would steal mail pieces containing credit cards issued to individual victims and send photos of the stolen credit cards to Oguntuyi through WhatsApp.  *See* **Exhibits 25 and 26**.  Review of the WhatsApp correspondence revealed images and information about approximately 250 credit cards, including specifically identified credit limits totaling approximately $995,389.  *See* **Exhibits 22 and 23**.  Oguntuyi would access and produce the

6

victims' dates of birth and social security numbers in order for the conspirators to activate the stolen credit cards and make fraudulent retail purchases. Through subpoenas for records associated with a number of the stolen credit cards, and interviews with several victim cardholders, the Government confirmed that fraudulent charges were made using many of the credit cards after Ogunlana stole them. *See, e.g.*, **Exhibits 8 through 21**, filed under seal at ECF No. 101 (records of 14 stolen credit card accounts). The investigation also revealed that the conspirators used the stolen credit cards specifically to purchase expensive personal electronics, as shown in photos displayed below, which they then sold for cash.






**Exhibit 13** (ECF No. 101-13 at 1, 2) lists fraudulent charges made in furtherance of the conspiracy totaling $15,415.26, exceeding the card's credit limit of $14,000.  These charges included several high-dollar purchases made at three different Apple Store locations in Maryland, apparently for expensive personal electronics.  The fraudulent purchases were made by co-conspirator Sunday Ajayi, who had received the credit card from Ogunlana in July 2018.  Review of the correspondence between Oguntuyi and Ogunlana shows that Ogunlana was specifically aware of the charges Ajayi made on the credit card in question.  *See* **Exhibit 25** at 1151-77.  Ajayi continued to receive more stolen credit cards to use in furtherance of the conspiracy for several months thereafter.  *See United States v. Ajayi*, Crim. No. CCB-21-242, ECF No. 19 at 11 (Plea Agreement, Attachment A).

**Exhibit 17** (ECF No. 101-17 at 3, 4) lists fraudulent charges made in furtherance of the conspiracy totaling $4,957.57, closely approaching the card's credit limit of $5,000.  Again, these charges included at least one high-dollar purchase made at an Apple Store location in Towson, Maryland in October 2018.

Thus, it is apparent that Ogunlana's conspiracy made charges on the credit cards close to or beyond the credit limits for at least some of the stolen cards.

### C.  Credit Limits Specified by Defendants Provide a Reasonable Estimate of Intended Loss for Stolen Credit Cards

As noted above, Ogunlana and Oguntuyi conspired to steal about 250 credit cards, and their correspondence through WhatsApp specified credit limits for 115 of these cards totaling approximately $995,389 and did so contemporaneously to the thefts.  *See* **Exhibit 23**.  By conspiring to steal the credit cards, Ogunlana and Oguntuyi deprived the victim cardholders of access to the credit associated with each of the credit cards and, upon activating the cards, converted that credit to their own use.  The pecuniary value of the credit associated with each

stolen card is the card's credit limit, and it was this value that Ogunlana and Oguntuyi stole from the victim cardholders. At the very least, the defendants were aware of the value of each of the credit cards for which a credit limit was specifically referenced in their WhatsApp correspondence. From this knowledge and the ongoing series of credit card thefts and fraudulent transactions, which spanned many months between 2016 and 2018, the Court may reasonably infer the defendants' intent to deprive each of the victims of access to and legitimate use of the credit associated with each of the cards, as valued by their credit limits. In short, Ogunlana and Oguntuyi intended to— and, at least temporarily, did—deprive the victims of access to and legitimate use of credit valued at (at least) $995,389.

Additionally, as noted above, some of the stolen credit cards in this case were exploited up to or beyond their credit limits. *See* ECF No. 101-13 at 1, 2 (**Exhibit 13** listing $15,415.26 in fraudulent charges on a card with a $14,000 credit limit); and ECF No. 101-17 at 3, 4 (**Exhibit 17** listing $4,957.57 in fraudulent charges on a card with a $5,000 credit limit). This fact indicates, at minimum, the conspirators' willingness to put the full credit limits associated with the credit cards at risk.[2]

The use of credit limits to determine or estimate loss resulting from stolen credit cards has been repeatedly adopted and endorsed by the courts, including District Judges of this Court. This method has been unsuccessfully challenged several times on appeal to the Fourth Circuit Court of Appeals. *See United States v. Weathers*, 581 F. App'x 273 (4th Cir. 2014) (affirming Judge

---

[2] WhatsApp correspondence between Ogunlana and Oguntuyi (**Exhibit 25** at 1151-77) indicates that they were displeased to learn that Ajayi had made the high number of purchases listed in **Exhibit 13** (ECF No. 101-13) without their approval. However, as noted above, Ajayi continued to receive stolen credit cards in furtherance of the conspiracy for several months after the charges in **Exhibit 13**. Ogunlana transferred these cards to Ajayi aware of the risk that they would be maxed out, and at least one such card was maxed out. ECF No. 101-17 (**Exhibit 17**).

Garbis); *United States v. Bratton-Bey*, 537 F. App'x 165 (4th Cir. 2013) (affirming Judge Legg);

*United States v. Muhammed*, 108 F. App'x 775 (4th Cir. 2004); *United States v. Lewis*, 312 F.

App'x 515 (4th Cir. 2008).  The Fourth Circuit is not alone in affirming this method of computing

intended credit card losses.  *See, e.g.*, *United States v. Harris*, 597 F.3d 242, 260 (5th Cir. 2010)

(finding no error in district court's calculation of intended loss based on credit limits of stolen

credit cards where "the defendants recklessly jeopardized the aggregate credit limits of the cards

they compromised"); *United States v. Manoocher Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th

Cir. 2001) ("[O]nce a defendant has gained access to a certain credit line by fraudulently applying

for credit cards, a district court does not err in determining the amount of the intended loss as the

total line of credit to which defendant could have access."); *United States v. Egmonye*, 62 F.3d

425, 428-29 (1st Cir. 1995) (affirming use of aggregate credit limits as measure of intended loss);

*United States v. Sowels*, 998 F.2d 249, 251-252 (5th Cir. 1993) (same).  Ogunlana fails to cite a

single case in which the Fourth Circuit rejected the use of credit limits to determine loss.

### 1. <u>*United States v. Lewis* (cited by the Government in ECF No. 92 at 4)</u>

*Lewis* involved the defendant's fraudulent use of a debit card for which there was a daily

credit limit of $27,000.  312 F. App'x at 517.  "To determine the amount of loss attributable to

Lewis [in his presentence investigation report], the probation officer used the $27,000 daily credit

limit on the fraudulent debit card for each of the six days Lewis possessed the card, for a total of

$162,000 as intended loss."  *Id.*  The district court accepted this loss computation, and the

defendant challenged that decision on appeal, "argu[ing] that use of the daily credit limit of the

debit card as intended loss was not supported by the record[.]"  *Id.*  The defendant pointed out that

he had only obtained between $5,000 and $10,000, and argued that the loss should be confined to

that amount of actual loss.  *Id.*  The Fourth Circuit panel rejected this argument and affirmed use of the daily credit limit to make a reasonable estimate of intended loss.  *Id.*

The Government's approach in the instant case is far more conservative.  The Government does not contend that the Court should multiply the credit limit for each of the stolen credit cards by the number of days the conspirators possessed and used them.  Instead, the intended loss amount may be reasonably estimated by totaling the credit limits specifically noted in correspondence between Ogunlana and Oguntuyi, without need to multiply these limits by the many days the conspirators possessed the cards and deprived the victim cardholders of their legitimate use.

2.   <u>*United States v. Muhammed*</u> (cited by the Government in ECF No. 92 at 4)

*Muhammed* involved the unlawful possession and fraudulent use of credit card account numbers the defendant maintained in several notebooks.  108 F. App'x at 775-76.  Although the defendant had only used 13 of the total 94 credit card accounts, resulting in less than $45,000 in actual losses, the district court determined higher intended losses for the many unused credit cards by using the credit limits of the cards with credit limits and $500 for each unused card without a credit limit, resulting in a total intended loss exceeding $220,000.  *Id.* at 776.  On appeal, the defendant challenged the factual basis for the district court's findings that he intended to use all of the credit card accounts and that he intended to use all available credit on each account.  *Id.* at 777.  The Fourth Circuit panel rejected this argument.  Evidence that the defendant exceeded the credit limits on five of the 13 accounts he used was sufficient to support the district court's conclusion that "the remaining victims were exposed to potential losses exceeding the credit limit for each account."  *Id.*

Similarly here, out of the sampling of 14 stolen credit cards for which the Government has produced evidence of fraudulent use and claimed restitution, records for two of the cards show that

the conspiracy maxed them out with fraudulent purchases.  *See* ECF No. 101-13 at 1, 2 ($15,415.26 in fraudulent charges with a $14,000 credit limit); and ECF No. 101-17 at 3, 4 ($4,957.57 in fraudulent charges with a $5,000 credit limit).  Considering that Ogunlana knowingly and willfully participated in this conspiracy aware of credit limits associated with stolen credit cards totaling at least $995,389, and aware that at least some of the credit cards were maxed out in furtherance of the conspiracy, Ogunlana intentionally risked the full credit limits of the stolen credit cards.

### 3.   *United States v. Diallo* (cited by Oguntuyi in ECF No. 102 at 7)

Ogunlana cites *United States v. Diallo*, 710 F.3d 147 (3rd Cir. 2013), an extra-Circuit case readily distinguishable from the instant case.  The defendant in *Diallo* pleaded guilty to possessing dozens of counterfeit credit cards and information for over 200 compromised credit card accounts, which could be loaded onto gift cards to create more counterfeit credit cards.  710 F.3d at 147-48.  At sentencing, the district court determined that the intended loss amount was the aggregate credit limit for all cards and account information that the defendant possessed, despite the lack of evidence that the defendant even knew the credit limits for the accounts.  *Id.* at 149.  The Third Circuit ultimately reversed the district court, having described the issue on appeal as follows: "This appeal requires us to determine how sentencing courts should calculate what 'pecuniary harm was intended to result' from credit card fraud when the fraud's perpetrator ***did not know*** the credit limit, which is the potential loss amount from the stolen credit card."  *Id.* at 150 (emphasis added).

Here, in contrast, the credit limits for cards stolen by Ogunlana and Oguntuyi which comprise the $995,389 loss figure were specifically noted in their correspondence via WhatsApp (*see* **Exhibits 23 and 25**), so Ogunlana clearly had guilty knowledge of the potential loss.  Furthermore, Ogunlana intended the loss in this total amount, having literally stolen ***the actual credit cards*** and thereby deprived the victim cardholders of possession and use of credit issued to

them.  By intercepting victims' credit cards before the victims could even possess them, Ogunlana effectively denied the victim cardholders access to the credit valued at the credit limit of each stolen credit card.  There is no indication in *Diallo* that the defendant's possession of compromised credit card *information* and *counterfeit* credit cards encoded with such information interfered with the victim cardholders' legitimate possession and use of their genuine and actual credit cards.  In other words, the victim cardholders only suffered pecuniary harm insofar as the defendant made actual fraudulent use of their accounts, or intended to do so.  Unlike *Diallo*, Ogunlana's cardholder victims were completely separated from, and deprived of, the use of their cards and suffered pecuniary harm in the amount of credit assigned to their stolen cards. The pecuniary harm was done and intended at the time of each theft and lasted for as long as it took for the victim cardholders and issuing companies to discover the fraud, cancel the stolen cards, and/or issue new cards to the cardholders.  The Third Circuit's reasoning in *Diallo*, therefore, has no application here.

The Third Circuit also distinguished *Diallo* from several other cases in which credit limits were used to assess intended loss: *United States v. Harris,* 597 F.3d 242 (5th Cir. 2010); *United States v. Bonanno,* 146 F.3d 502 (7th Cir. 1998); and *United States v. Staples,* 410 F.3d 484 (8th Cir. 2005).  The court noted that, unlike *Diallo*, the foregoing cases "involved either defendants who recklessly transferred the credit information to a third party, thereby placing the full potential loss at risk, or defendants who had knowledge of and actually intended the maximum potential loss."  *Diallo*, 710 F.3d at 150.  The instant case is distinguishable from *Diallo* on the same grounds.  Here, the WhatsApp correspondence proves that Ogunlana had specific knowledge of the credit limits for 115 credit cards he stole and thereby deprived the victims of that value.  Additionally, a number of the stolen cards were transferred to third parties, including Sunday

Ajayi, placing the full credit limits on those cards at risk. Indeed, at least two of the stolen credit cards Ogunlana transferred to Ajayi were exploited up to or beyond their credit limits. *See* ECF No. 101-13 at 1, 2 (**Exhibit 13** listing $15,415.26 in fraudulent charges on a card with a $14,000 credit limit); and ECF No. 101-17 at 3, 4 (**Exhibit 17** listing $4,957.57 in fraudulent charges on a card with a $5,000 credit limit).

Finally, *Diallo* is a Third Circuit case and not binding on this Court.

In summary, the Government has shown by a preponderance of the evidence that Ogunlana intended losses from 115 credit cards he conspired to steal in the amounts of credit limits noted for these cards in correspondence between him and Ogunlana, which total approximately $995,389. *See* **Exhibit 23**. This figure represents the value of credit that the conspirators knew they were depriving, taking, and separating from the victims—satisfying any reasonable definition of "loss." And it is a reasonable estimate of intended loss for this subset of 115 credit cards, which is all that U.S.S.G. § 2B1.1 requires.

### D. Any Reasonable Estimate of Intended Loss for Each Stolen Credit Card Without a Specified Credit Limit Would Be At Least $500

There remains the matter of the numerous credit cards stolen by the defendants for which no credit limit was specifically noted in their correspondence via WhatsApp. There was more than 150 of such credit cards.[3] Before undertaking to estimate intended loss from this category of stolen credit cards, it is important to note that (unless such loss is estimated to exceed $2 million) this portion of the loss amount will not affect the U.S.S.G. § 2B1.1(b)(1) enhancement. The losses of $565,000 from stolen business checks and $58,888 from the "EZ Go Towing" and "P.R. Production" checks, combined with the credit limits totaling $995,389 discussed in Part II.C above,

---

[3] Subtracting the 115 credit cards for which credit limits were specified in the WhatsApp correspondence (listed in **Exhibit 23**) from total 278 credit cards identified or noted in the correspondence (listed in **Exhibit 22**), results in 163 credit cards that fall under this category.

by themselves, exceed $1,500,000 and therefore warrant a 16-level enhancement under § 2B1.1(b)(1)(I). If the Court accepts these loss amounts, for which there is ample evidence to make a reasonable estimate, then it need not address the matter of loss for the many stolen credit cards whose credit limits were not specified in the defendants' WhatsApp correspondence.

Notwithstanding, the Government's position is that $500 is a conservative estimate of loss that the defendants intended from each credit card they stole for which no credit limit was specifically noted. The exhibits attached to the Government's restitution request strongly support the its position. *See Wolf*, 860 F.3d at 197 (sentencing court "need only make a reasonable estimate of the loss, given the available information").

At ECF No. 101, the Government attached to its request for restitution account records for 14 credit cards stolen in connection with the conspiracy in this case. *See* ECF No. 101, **Exhibits 8 through 21**. These records identify in yellow highlights the amounts of fraudulent purchases made with each card. For convenience, these amounts are listed in the table below:

| Exhibit | Description | Amount of Fraud Charges |
|---------|-------------|------------------------:|
| Exhibit 8 | Bank of America card issued to B.L.S. | $524.54 |
| Exhibit 9 | American Express card issued to B.L.S. | $3,790.64 |
| Exhibit 10 | Synchrony/ Walmart card issued to S.S. | $1,600.77 |
| Exhibit 11 | Citibank card issued to V.M. | $198.88 |
| Exhibit 12 | Citibank card issued to A.D. | $1,767.16 |
| Exhibit 13 | Citibank/ L.L. Bean card issued to E.E.L. | $15,415.26 |
| Exhibit 14 | Citibank card issued to B.I.S. | $1,646.44 |
| Exhibit 15 | Chase/ Southwest card issued to W.S. | $1,838.04 |
| Exhibit 16 | Chase card issued to K.Y. | $2,472.22 |
| Exhibit 17 | Capital One card issued to E.L. | $4,957.57 |
| Exhibit 18 | Capital One card issued to J.G. | $2,276.88 |
| Exhibit 19 | Bank of America card issued to S.M. | $3,308.07 |
| Exhibit 20 | American Express/ Macy's card issued to C.F. | $1,121.24 |
| Exhibit 21 | Discover card issued to S.T. | $949.76 |
| | | **$41,867.47** |

Dividing the total amount of fraudulent charges ($41,867) by the number of listed credit cards (14) results in an average amount of fraudulent charges for a single card: approximately $2,990.  Thus, $2,990 provides a fair estimate of loss intended from each stolen credit card for which the defendants did not specifically know the credit limit.  Any estimate of intended loss less than $2,990 per card would be a conservative estimate.  The Government's proposed estimate of $500 per card is significantly less than the average and very conservative.

Applying the $2,990 average to the more than 150 credit cards identified in the defendants' WhatsApp correspondence without mention of a credit limit, would result in an estimated intended loss of $448,500.  The Government has proposed the far more conservative figure of $50,000 ($500 x just 100 cards).

But, again, if the Court accepts the undisputed loss of $565,000 from stolen business checks, losses totaling $58,888 from the "EZ Go Towing" and "P.R. Production" checks, and the aggregate $995,389 credit limit of cards for which credit limits were specifically noted in the WhatsApp correspondence, the estimated loss for the credit cards will have no effect on the U.S.S.G. § 2B1.1(b)(1) enhancement.  Either way, the total intended loss exceeds $1,500,000 and will result in a 16-level enhancement and, for Ogunlana, a Sentencing Guidelines range of **132 months to 159 months**.  The Government recommends a total sentence at the low end of this range.

## II.    Ogunlana's Request For a Variance Down to the 24-Month Minimum Is Unjustified

In his memorandum filed at ECF No. 95, Ogunlana requests a drastic downward variance to the statutory minimum sentence of two years, asking this Court to impose concurrent probationary sentences for Count One (Conspiracy to Commit Bank Fraud and Mail Fraud), Count Twelve (Access Device Fraud), and Thirty-Two (Theft of Mail by Postal Employee).  Ogunlana's request is not only extreme, but it is illegal.  As Ogunlana acknowledges, 18 U.S.C. § 1028A

16

requires that the mandatory two-year sentence on Count Twenty-Three (Aggravated Identity Theft) be imposed consecutively to any sentences imposed on the remaining counts.  Additionally, 18 U.S.C. § 3561(a) forbids a sentence of probation for any Class A or Class B felony.  As noted on Page 1 and in Paragraphs 67 and 75 of the PSR, Count One (Conspiracy to Commit Bank Fraud) is a Class B felony for which a maximum sentence of 30 years may be imposed pursuant to 18 U.S.C. §§ 1344 and 1349.  The Court cannot grant a probationary sentence for this offense.

The only justifications offered for such an extreme variance are a generalized attack against the Sentencing Guidelines in financial fraud cases, which have nothing to do with the particulars of this case, and laudatory statements about Ogunlana's character that are belied by the evidence and Ogunlana's behavior while on pretrial release.  Each of these sets of arguments are addressed in turn below.

### A. Applicable Sentencing Guidelines Factors Represent Significant Aggravating Circumstances In This Case

It is abundantly clear that the factual grounds for each of the applicable Sentencing Guidelines factors are significant aggravators that warrant substantial increases in Ogunlana's sentence.  Ogunlana's generalized attack on the Sentencing Guidelines falls flat in light of these aggravating facts.

1. Ogunlana's Conduct Was Intricate In Its Organization and Sophistication

First, with respect to the two-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10), Ogunlana's conspiracy involved nothing less than

1) the systematic theft of business checks from the incoming mail of targeted business victims;

2) the filing false business formation documents in several different states to register fake businesses in names similar to the victims (Evan Transportation Inc. and DeVere Insulation

Company), while listing the names of identity-theft victims (such as T.B. and J.C.) as corporate officers;

3) the registration of Employer Identification Numbers ("EINs") with the IRS for these fake businesses, again using the personal identifying information ("PII") of identity-theft victims as registrants;

4) using the fraudulent EINs, fraudulent business formation documents, and stolen identities to open numerous business accounts at several different banks in multiple states; and

5) utilizing co-conspirators to assume the risk of performing tasks in furtherance of the conspiracy, such as opening fraudulent business accounts, negotiating stolen checks, making fraudulent purchases with stolen credit cards, and conducting sales of the merchandise.

These methods were designed to mask Ogunlana's and Oguntuyi's participation in the conspiracy. The two-level enhancement in § 2B1.1(b)(10) requires far less sophisticated means than the foregoing. There can be no doubt that the enhancement is meaningful in this case and justifies a substantial increase in Ogunlana's sentence.

And this is not a case where the defendant could claim that he did not know about, or had nothing to do with, the foregoing activities. Evidence acquired during the investigation shows that Ogunlana was personally familiar with registering businesses and opening bank accounts. For example, items found in Ogunlana's possession during the execution of search warrants on February 5, 2019, included a ripped Internet-generated receipt from the Maryland Department of Assessments and Taxation for business formation and registration fees (**Exhibit 28**), as well as both a debit card and PIN mailer issued by SunTrust to identity-theft victim T.B. for a fraudulent account opened in the name of business victim Devere Insulation Company (**Exhibit 29**).

Ogunlana also personally employed Ajayi to conduct fraudulent credit card purchases, minimizing risk to himself, and even received assistance from his older brother Richard Allison[4] to sell the merchandise purchased.

### 2. Defendants Produced and Trafficked Unauthorized Access Devices and Means of Identification

Second, the § 2B1.1(b)(11) enhancement of two levels for producing and trafficking unauthorized access devices and means of identification reflects several aggravating circumstances in this case. After stealing a credit card and related material from the mail, which Ogunlana did on a continuous and serial basis, he would send photos of the cards and, at least sometimes, the cards themselves to Oguntuyi. Additionally, the defendants did not only steal and activate credit cards specifically applied for by the individual victims; they also used the victims' PII to cause issuance and mailing of new credit cards the victims never requested or applied for. In this way, the defendants *both* trafficked *and produced* unauthorized access devices. Furthermore, the means by which the defendants produced unauthorized access devices constitutes a third basis upon which the § 2B1.1(b)(11) enhancement is warranted here: the use of victims' means of identification (i.e., their names, dates of birth, and social security numbers) to produce and obtain other means of identification (i.e., credit cards issued in the victims' names without their permission and intercepted from the mail by the defendants). Thus, the § 2B1.1(b)(11) enhancement is doing a

---

[4] The defense has submitted a character letter from Allison falsely implying that he knew nothing about Ogunlana's criminal activity while it was occurring. A recorded jail call that Ogunlana had with his then-girlfriend Jennie Ford on May 21, 2018, while Ogunlana was detained in Fairfax County, Virginia on DWI charges (*see* PSR ¶ 42), shows an attempt by Allison and other relatives of Ogunlana to retrieve a cache of personal electronic merchandise Ogunlana stored in his home. *See* **Exhibit 30** (excerpted transcript). WhatsApp correspondence between Ogunlana and Allison (listed as "Big Bro") shows that Allison eventually obtained and sold some of this merchandise, then brokered and facilitated additional sales for Ogunlana after Ogunlana's release, and was also involved in discussions between Ogunlana and Oguntuyi (called "Jeje" in the text messages) about fraudulent purchases made with stolen credit cards (called "pako" in the texts). *See* **Exhibit 31** (excerpted WhatsApp correspondence between Ogunlana and Allison).

lot of work in this case by capturing not only the transfer of legitimate credit cards stolen from the mail, but also the repeated and systematic exploitation of victims' identities to create fraudulent credit card accounts without the victims' knowledge or consent.   A substantial increase in Ogunlana's sentence is fully merited by this wide range and longstanding course of criminal behavior.

       3.   <u>Defendants Victimized Over 250 Individual Victims and Numerous Businesses</u>

      Third, this case involves a far greater number of victims than that required by the two-level enhancement under § 2B1.1(b)(2)(A).  All that § 2B1.1(b)(2)(A) requires is 10 victims.  This case involves well over a dozen institutional victims and well over 250 individual victims whose identities or credit cards (or both) were stolen.  Some of the individual victims were exploited more thoroughly than others.   For instance, the identities of T.B. (a Maryland resident living on Ogunlana's mail delivery route) and J.C. (a Georgia resident apparently swept into the case personally by Oguntuyi) were used over and over again by the defendants—to form shell businesses, to register EINs, to open fraudulent business bank accounts, and to forge endorsements on numerous stolen checks.  In this way, Ogunlana and Oguntuyi hid behind victims like T.B. and J.C. in conducting their fraud scheme and exposed these victims to potential civil liability and even criminal charges for all the fraud the defendants committed.   Other victims' identities were used simply to activate credit cards the defendants stole from them and to make fraudulent purchases with the cards.   But each of the victims was targeted, impacted, and at least exposed to grave harm by Ogunlana's rampant thefts of mail and by Oguntuyi's eager pursuit and capture of the victims' sensitive personal information and transfer of that information to Ogunlana.

4.  <u>Ogunlana Profited From His Crimes</u>

Ogunlana seeks to draw attention away from the loss factor in this case by minimizing how much he gained and stood to gain from his serial thefts and frauds.  There can be no question that Ogunlana stood to gain substantially from his longstanding criminal schemes; there was no other reason for him to engage in these crimes.  With respect to the stolen credit cards, Ogunlana has stipulated that he sold merchandise fraudulently purchased with these cards (including valuable consumer electronics) on the street for cash.  PSR ¶ 12.  With respect to the stolen business checks, Ogunlana has stipulated that, after the checks were fraudulently deposited into various accounts, funds were withdrawn from the accounts through cash withdrawals and cash-back transactions. PSR ¶ 19.  It is no coincidence that, during the time period of the conspiracy, both Ogunlana's and Oguntuyi's bank accounts received substantial cash deposits.

Regarding Ogunlana, a review of records of bank accounts Ogunlana held in his own name at PNC Bank reveals that, between December 2017 and March 2019, the account received substantial cash deposits, separate and apart from direct deposits from USPS as employment income.  There were approximately 146 cash deposits totaling approximately $56,000.  The individual deposits ranged in amounts from $20 to $1,660 and were mostly made at ATMs in the Baltimore metropolitan area.  Ogunlana made multiple cash deposits on approximately 35 dates. The deposits were most frequent between July 2018 and January 2019, during which time Ogunlana stole all of the checks from DeVere Insulation Company and Evan Transportation Inc. involved in the case, and included about 100 cash deposits totaling approximately $35,000.  Prior to receiving payments from USPS in a PNC Bank account, Ogunlana received payments into a State Employees' Credit Union account, and records for that account also received numerous ATM deposits during the time frame of the conspiracy.

21

5. <u>Ogunlana Flagrantly Abused the Public's Trust On a Serial Basis</u>

Finally, Ogunlana's habitual and repetitive betrayal of his oath and duties as a USPS letter carrier over the course of more than two years fully warrants the increase of his sentence called for by U.S.S.G. § 3B1.3. When Ogunlana joined the Postal Service in October 2014, he swore an oath to "well and faithfully discharge the duties" of his office and declared his understanding of his duty to "protect the United States mail, Postal Service property, and assets[.]" He also signed a separate document acknowledging his duty to "preserve and protect the security of all mail in [his] custody from unauthorized opening, inspection, tampering, delay, reading of the contents or covers, or other unauthorized acts." **Exhibit 32**. The same document called Ogunlana's attention to 18 U.S.C. § 1709, the offense charged in Counts Twenty-Eight through Thirty-Two of the Second Superseding Indictment, and notified him that he could be imprisoned for stealing, delaying, deserting, destroying, or obstructing U.S. mail. *Id.* Notwithstanding, his oaths and acknowledgements, Ogunlana spent practically half of his time as a USPS employee abusing that position for personal gain on a routine—sometimes daily—basis.

**Exhibit 33** is a 13-minute video compilation that offers a just a glimpse of how Ogunlana spent his time as a USPS letter carrier and his flagrant abuse of the community's trust. The images were captured by a covert camera installed in Ogunlana's assigned postal delivery vehicle between December 21, 2018, and January 11, 2019. The video compilation shows Ogunlana opening mail, reviewing the contents, paying special attention to credit cards found inside, signing credit cards, placing items of interest inside his lunch cooler, and discarding envelopes out the window of the vehicle. (**Exhibit 33-A** is a compilation of still images from the video.)

It is clear that the community has suffered an erosion of trust in the integrity of the Postal Service and commercial parcel delivery services. An unfortunate lesson of this case is that the

public's lack of trust is justified.  It is not hard to imagine a world in which society's trust in the postal system is completely lost and the gross disruptions and inefficiencies of daily life that would result.  Indeed, there are countries where such a dystopia is the harsh reality due to widespread postal theft.  It is conduct like Ogunlana's that pushes our nation closer to such a disturbing outcome, and an increase of his sentence to account for this fact is fully warranted.

In summary, the Sentencing Guidelines in this case are as high as they are for many reasons—all reasons created by specific choices that Ogunlana personally and willfully made.  The circumstances of this case are not the fault of Congress or the Sentencing Commission but are Ogunlana's own.  Any reasonable sentence in this case must take full account the cumulative gravity of Ogunlana's 30-month course of intricate, treacherous, and prolific criminal schemes.

### B.  Ogunlana's Crimes Were Unusually Serious, By Any Reasonable Measure

By now, it should be apparent to the Court that the nature and circumstances of the defendants' crimes in this case were extraordinarily serious.  Even setting aside the applicable factors provided in the Sentencing Guidelines, any reasonable and objective measure of criminal conduct would call for a substantial and lengthy prison sentence in this case.

Let us take, for example, the alternative guidelines outlined in a document cited by Ogunlana on page 7 of his sentencing memorandum: "A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes, Final Draft," dated November 10, 2014, available at https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf (the "2014 ABA Task Force Report") (last accessed on January 21, 2021).  The proposed guidelines advocated in the 2014 ABA Task Force Report diminish the influence of loss amounts in the determination of the sentencing range, but makes up for it by focusing on loose standards of

"culpability" and "victim impact."  *See id.*[5]  Even by these standards, Ogunlana's criminal conduct was unusually serious.

1. <u>Ogunlana's Culpability for the Offenses Is Extremely High</u>

The 2014 ABA Task Force Report recommends that culpability be assessed based on a non-exhaustive list of factors, including

- the defendant's motive (including the general nature of the offense);
- the correlation between the amount of loss and the amount of the defendant's gain;
- the degree to which the offense and the defendant's contribution to it was sophisticated or organized;
- the duration of the offense and the defendant's participation in it;
- extenuating circumstances in connection with the offense;
- whether the defendant initiated the offense or merely joined in criminal conduct initiated by others; and
- whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense.

*Id.* at 1.  Notably, several of these factors are broken out as specific offense characteristics in U.S.S.G. § 2B1.1 and result in enhancements applicable in this case, as outlined in ¶¶ 27-32 of the PSR and further discussed in Part II.A above.

The factors listed above that are not emphasized in § 2B1.1 all underscore Ogunlana's high culpability for his series economic crimes in this case.  Specifically, it is apparent that the defendants' crimes were motivated by greed, the duration of the conspiracy lasted a lengthy period

---

[5] It is important to note that the numerical offense level enhancements were viewed by the ABA Task Force as less important than the overall structure of the proposal and are "placed in brackets to indicate their tentative nature."  *Id.* at 9.  This caveat cautions against any effort to compute what Ogunlana's offense level would have been if the guidelines proposed in the report were the law of the land.

of 30 months,[6] and there were no extenuating circumstances that mitigate or to any degree justify the offenses. Indeed, Ogunlana's salary as a USPS employee was more than adequate to support himself like any law-abiding citizen. The ABA Task Force would classify Ogunlana's motive as "predatory"—that is, "intended to inflict loss for the sole or dominant purpose of generating personal gain to the defendant or to others involved in the criminal undertaking" and "accompanied by no legitimate purpose"—which makes Ogunlana's crimes "among the most culpable types of offenses[.]" *Id.* at 2.

Furthermore, by all indications, Ogunlana and Oguntuyi started the conspiracy together, rather than Ogunlana being recruited into it, and Ogunlana did not withdraw from the conspiracy before he was confronted by law enforcement on February 5, 2019.[7] There were a number of business checks that Ogunlana stole but never attempted to negotiate and ultimately did not transfer to Oguntuyi. Instead of withdrawing from the conspiracy or seeking to mitigate the harm by returning the checks to their owners, Ogunlana simply destroyed them. Seven ripped checks payable to DeVere Insulation Company and Evan Transportation Inc. were found in Ogunlana's personal vehicle on February 5, 2019.

Ogunlana's very high culpability is without question.

---

[6] "Criminal undertakings that extend over several months or longer suggest a greater degree of culpability[.]" *Id.* at 4.

[7] There was a brief time period in April 2018 during which Ogunlana expressed to Ajayi an intention to cease involvement in credit card fraud, but Ogunlana was back at it within days. A few weeks later, Ogunlana was stopped by law enforcement in Northern Virginia, found in possession of numerous credit cards he had stolen from postal customers, and arrested for DWI and Disorderly Conduct. *See* PSR ¶ 42.

2.  <u>Ogunlana's Impact On Victims and Abuse of Their Vulnerabilities Were Substantial</u>

Victim impact factors listed in the 2014 ABA Task Force Report include the vulnerability of victims and non-economic harms.  *Id.* at 4-5.  (Much has already been said in this memorandum about economic harm and the very high number of victims in this case.)  Ogunlana's victims were highly vulnerable to his brazen dereliction of duty.  Virtually everyone in the community depends heavily on the integrity of the postal system and the financial system.  It can be very difficult for postal customers to know if or when anyone has stolen important documents and/or financial instruments from their incoming or outgoing mail, or who may be responsible for any thefts that are eventually discovered, or the extent to which sensitive and confidential personal and financial information has been compromised.  Criminally inclined postal workers like Ogunlana are uniquely situated to prey upon this vulnerability.

Individual victims like T.B., J.C., S.S., V.M., and others were notified through the investigation in this case that their identities were compromised, but neither they nor the Government can know the full extent of the compromise.  No one can know whether they will find fraudulent charges made or fraudulent accounts opened in their names at some point in the future and whether it will, for example, disrupt their efforts to obtain credit when they need it or place them at risk of referral to debt collection or even being sued or criminally charged.  Thus, even in cases where individual victims are not financially impacted or any losses are reimbursed by their banks and credit card companies, there is no denying that identity theft takes a lasting toll on victims.  Identity theft victims commonly speak about the constant stress, anxiety, and insecurity that comes along with learning that one's personal information has been compromised and exposed for use in an endless series of financial fraud schemes.

The experiences of the business victims Evan Transportation Inc. and DeVere Insulation Company offer further illustration of how vulnerable postal customers are to the predation of criminal postal workers like Ogunlana.  In its victim impact statement, Evan Transportation Inc. notes expenses not just for stolen checks that were never reimbursed but also time spent by business managers conducting research and working with banks, customers, and law enforcement to investigate, dispute, and resolve the missing checks; making fraud claims and affidavits; and picking up 52 check payments from customers to avoid further thefts.  **Exhibit 1** (ECF No. 101 at 3).  From the list of expenses alone, it is apparent that Ogunlana's serial theft from the business was not just a financial burden but an administrative nightmare and may have even strained business relationships between the victim and various customers.  The ordeal was even worse for DeVere Insulation Company, having suffered a far greater number of check thefts (approximately 89) than Evan Transportation Inc. (approximately 23).[8]

3. Ogunlana Poses an Acute Economic Danger to the Community

One critical sentencing factor in theft and fraud cases that may not be adequately accounted for in either the U.S. Sentencing Guidelines or proposed alternatives like the 2014 ABA Task Force Report is the extent and frequency of the defendant's thefts and deceptions.  This factor should weigh heavily in any sentencing court's assessment of the economic danger a theft or fraud defendant pay pose to society.  The frequency and extent of Ogunlana's thefts and fraudulent transactions during the 30-month span of the conspiracy were incredibly high (occurring multiple times per day at times) and establish that he poses an unbearable risk to the economic well-being of the community.  A lengthy term of incarceration is therefore necessary to protect the public and

---

[8] DeVere Insulation Company has declined to submit a victim impact statement, expressing to undersigned counsel that it wishes to spend no more time or effort on this matter, given what they believed to be a low likelihood of actually collecting restitution for their losses.

to reflect the seriousness of Ogunlana's criminal involvement, to provide just punishment, and to protect the public from further crimes.

### C. Ogunlana's Character For Deceit Is Firmly Established

It takes an individual of extreme deceitfulness to engage in the criminal offenses and conspiracy conducted by Ogunlana for as long as, and with the high frequency, that Ogunlana did. The fact that Ogunlana was undeterred from his thefts and frauds after being stopped by the police in May 2018 and found in the possession of 22 credit cards stolen from postal customers, speaks volumes about the stubbornness of Ogunlana's corruption and greed. Instead of counting himself lucky for not being charged federally with mail theft and identity theft at that point and avoiding further criminal involvement, Ogunlana resolved simply to mitigate his personal risk by avoiding personal use of the stolen cards and having others, like Ajayi, conduct the fraudulent transactions for him. *See* **Exhibit 31** at 32 (Ogunlana telling Richard Allison that he "can't even go inside store or nontin [nothing] that have to do with pako [credit cards] at all" until he gets out of trouble ("wahala") and that he needs to "slow down"). Even so, Ogunlana failed to avoid being caught on camera at two separate locations with Ajayi using a credit card that Ogunlana stole. *See* PSR ¶ 12; *United States v. Ajayi*, Crim. No. CCB-21-242, , ECF No. 19 at 11 (Plea Agreement, Attachment A). And, while Ogunlana was likely content to have Oguntuyi and others risk themselves by depositing stolen checks into fraudulent bank accounts numerous times, Ogunlana was caught doing the same on at least two occasions. PSR ¶ 17.

The covert video surveillance of Ogunlana in December 2018 and January 2019 illustrates his lack of hesitation to rifle and steal items from the mail and even litter unused material by discarding it out the window of his postal vehicle. *See* **Exhibits 33 and 33-A**. Consistent with his pattern of lies and treachery, Ogunlana attempted to place all blame on his co-conspirators and

falsely claimed duress when he was finally confronted about his thefts and frauds by federal agents on February 5, 2019.  *See* ECF No. 55-3.

Ogunlana's pattern of deceit has apparently been undeterred even by the instant prosecution and is ongoing as of this month.  After several location monitoring-related violations of conditions of pretrial release, and an arrest in September 2021 for DWI and Reckless Driving (*see* PSR ¶ 47), Ogunlana currently remains on release under conditions of location monitoring and is restricted from driving.  The U.S. Probation Office reports that Ogunlana recently gave several conflicting accounts upon questioning by his supervising officer about detected deviations from approved foot travel.  Ogunlana eventually admitted traveling by car to at least two unapproved locations after at least two false accounts of his whereabouts.  He claimed that his mother drove him.  At a bail review hearing on January 24, 2022, Ogulana was ordered to "24-hour-a-day lockdown" at his home pending his sentencing hearing.

For certain, the sentence in this case has much work to do if it is to deter someone of Ogunlana's character and access as a postal worker, to protect the community further crimes, to impart respect for the law, and to reflect the seriousness of the crimes he and Oguntuyi committed together over the course of more than two years.  A total sentence of 132 months followed by five years of supervised release are necessary to satisfy these purposes of sentencing.


[SPACE INTENTIONALLY LEFT BLANK]

III.    **Conclusion**

    For the foregoing reasons, and additional reasons outlined in the Government's original sentencing memorandum (ECF No. 92), the Government respectfully recommends a total sentence of 11 years of imprisonment followed by a five-year term of supervised release.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:      /s/
        Matthew J. Maddox
        Assistant United States Attorney

        Michael F. Davio
        Special Assistant United States Attorney

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that, on this 25th day of January, 2022, a copy of the foregoing Memorandum in Opposition to Defendant Oguntuyi's Sentencing Memorandum were served on counsel for defendants via CM/ECF.

By:      /s/
        Matthew J. Maddox
        Assistant United States Attorney